UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

_____
}
BOSTON TAXI OWNERS ASSOCIATION, INC.  }
STEVEN GOLDBERG                        }
     PLAINTIFFS                      }
                                       }
v.                                     }
                                       }
                                       }    Civil Action No.:
                                       }
ANGELA M. O'CONNOR, CHAIRMAN           }
JOLETTE A. WESTBROOK, COMMISSIONER     }
ROBERT HAYDEN, COMMISSIONER            }
DEPARTMENT OF PUBLIC UTILITIES,        }
STEPHANIE POLLACK, TRANSPORTATION      }
SECRETARY, MASSACHUSETTS               }
DEPARTMENT OF TRANSPORTATION,          }
GOVERNOR CHARLES BAKER,                }
THOMAS P. GLYNN, CEO                   }
MASSACHUSETTS PORT AUTHORITY           }
DAVID M. GIBBONS, EXECUTIVE DIRECTOR   }
MASSACHUSETTS CONVENTION CENTER        }
AUTHORITY                              }
     DEFENDANTS                      }
_____}


## COMPLAINT

## I.    INTRODUCTION

1. Plaintiffs are an individual and entity representing individuals engaged in the licensed

taxi industry in Boston. They have brought this case because the Commonwealth of

Massachusetts (the "Commonwealth") has arbitrarily violated their constitutional rights

by: (1) enacting a new law that applies to so-called Transportation Network Companies

(hereinafter "TNCs") (for example, Uber, Lyft and others) permitting them to operate in

the Commonwealth and, (2) preempting cities and towns from regulating the TNCs, all

the while allowing cities and towns to exclusively regulate the taxi industry creating a system where two similarly situated industries are being regulated by different government bodies in an entirely unequal way thereby violating the taxi owners' constitutional rights.

2. The Commonwealth is allowing cities and towns to apply burdensome and costly taxi regulations to taxi owners and operators, while the Commonwealth regulates TNCs in a much less onerous and costly way and without requiring TNCs to comply with municipal regulations.

3. Both the Plaintiffs and the TNCs engage in the very same business – driving individual passengers on demand for hire ("For-Hire Transportation").

4. The Commonwealth is violating Plaintiffs' constitutional rights to just compensation, equal protection and due process by arbitrarily:

   a. Enacting legislation that regulates the TNC industry to allow TNCs to operate with much less government regulation and interference than the taxi industry system;

   b. Creating a system where cities and towns exclusively regulate the taxi industry but are preempted from regulating TNCs with is no legitimate reason as the industries are similarly situated; and

   c. Allowing the City of Boston to require taxi operators to buy expensive City taxi licenses (known as "medallions") for over seventy-five (75) years (which have in recent years cost hundreds of thousands of dollars each), and not applying that same requirement to TNCs but rather allowing them to operate without them.

    d.  Effectively the Commonwealth allows TNCs to skirt all the cost and burden but not the opportunity to engage in the same business.

5. The Plaintiffs have brought this lawsuit because the Commonwealth now permits TNCs to operate based on the new law without complying with the same regulations that taxi owners and operators have to comply with despite the fact that the two industries engage in the same business, For-Hire Transportation.

6. The new law, passed by the Massachusetts Legislature on the last day of the legislative session, July 31, 2016 and enacted on August 5, 2016, Chapter 187 of the Acts of 2016, An Act Regulating Transportation Network Companies (hereinafter referred to as "TNC Law") creates an irrational, two tiered regulatory system that unconstitutionally harms the economic property interests and equal protection of taxicab medallion owners and drivers (see Chapter 187 of the Acts of 2016, attached hereto as Exhibit A).

7. The TNC Law allows TNCs and their drivers to operate with little oversight while continuing to subject licensed taxicab medallion owners and licensed drivers to stringent, economically oppressive regulations.

8. In particular, the TNC Law allows TNCs to use practically any vehicle, charge any fare and not obtain commercial insurance, while requiring taxicab medallion owners and drivers to use specific vehicles, charge set rates, obtain certain insurance and incur mandated expenses.

9. For example, a TNC driver, using a tablet or cell phone app, may pick up a rider using a private vehicle and charge practically any price.  If a taxicab driver, using a similar app, picks up that same rider, the taxicab driver must be in an approved vehicle and must charge the passenger no more than nor less than the city-approved rate.  This irrational

economic disparity violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

10. Under the Due Process Clause, the TNC Law harms the taxicab medallion owners' property interests by effectively eliminating entirely any cap on the number of taxicab medallions (negatively impacting their value).

11. The TNC Law is fashioned and drafted in an arbitrary and capricious manner, and will cause economic harm to the current taxicab medallion owners.

12. The Plaintiffs seek declaratory and injunctive relief and monetary damages.

## II. PARTIES

13. Plaintiffs and Defendants are as follows:

   a. Plaintiff, Boston Taxi Owners Association, Inc., is a Massachusetts non-profit corporation with a principal place of business at 267 N. Beacon Street, Suite 2, Brighton, MA 02135.  This entity represents individuals who collectively own hundreds of taxicab medallions in the City of Boston.

   b. Plaintiff, Steven Goldberg, is a licensed taxi driver and owner of three taxicab medallions with a usual address at 47 Crystal Way, Bellingham, MA  02019.

   c. Plaintiffs are directly and detrimentally impacted by the TNC Law and/or lack of enforcement of existing taxicab laws as to the TNC's and their drivers.

   d. Defendants, Angela M. O'Connor, Chairman, Jolette A. Westbrook, Commissioner, and Robert Hayden, Commissioner, are officials of the Department of Public Utilities, Commonwealth of Massachusetts, a state agency named in the TNC Law with the authority to oversee the TNCs and their drivers.

e.  Defendant, Stephanie Pollack, Transportation Secretary, is an official of the Massachusetts Department of Transportation, Registry of Motor Vehicles, a state agency named in the new TNC Law.

f.  Defendant, Governor Charles Baker, Governor of the Commonwealth of Massachusetts, enacted the TNC Law, and the state agencies that he oversees will enforce the TNC law.

g.  Defendant, Thomas P. Glynn is the Chief Executive Officer of the Massachusetts Port Authority ("Massport") which is a port authority that owns and operates three airports—Boston Logan International Airport, Hanscom Field, and Worcester Regional Airport—and public terminals in the Port of Boston. It is a financially self-sustaining public authority.

h.  Defendant, David M. Gibbons is the Executive Director of the Massachusetts Convention Center Authority ( "MCCA") which is a public authority that owns and oversees the operations of the Boston Convention & Exhibition Center ("BCEC"), The Lawn on D Powered by Citizens Bank, the John B. Hynes Veterans Memorial Convention Center, the MassMutual Center in Springfield, and the Boston Common Garage.

## III. FACTUAL ALLEGATIONS

14. On August 5, 2016, the TNC Law was enacted which regulates Transportation Network Companies ("TNCs").

15. The Boston taxi industry is highly regulated by state statutes, city rules and ordinances and multiple agreements that specify how medallion owners, radio associations, drivers and credit card processors must operate together.

16. These legal controls are designed to ensure that taxi services will operate safely, reliably and without discrimination.

17. The Massachusetts legislature has given cities and towns authority to regulate vehicles that convey people from place to place for hire.

18. Pursuant to M.G.L. c. 40, § 22, "a city or town may make ordinances or bylaws, or the board or aldermen or the selectmen or town council may make rules and orders, for the regulation of carriages and vehicles used therein." (See M.G.L. c. 40 § 22, attached hereto as Exhibit B).

19. The Massachusetts legislature provided the City of Boston with exclusive authority to regulate all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the City of Boston." (See Massachusetts Session Laws of 1930, Chapter 392, attached hereto as Exhibit C).

20. These laws conflict with the TNC Law that was recently enacted which contains a preemption section, which reads as follows:

> Section 10.  Except where expressly set forth in this chapter, no municipality or other local or state entity, except the Massachusetts Port Authority, may: (i) impose a tax on or require any additional license for a transportation network company, a transportation network driver or a vehicle used by a transportation network driver where the tax or license relate to facilitating or providing pre-arranged rides; (ii) require any additional license for a transportation network company or transportation network driver; or (iii) subject a transportation network company to the municipality's or other local or state entity's rates or other requirements, including but not limited to operational requirements; provided, however, that a municipality or other local or state entity may regulate the traffic flow and traffic patterns to ensure public safety and convenience.

21. There exists a conflict between the current Massachusetts laws, as certain statutes allow cities and towns to regulate motor vehicles that are "used for the conveyance of

persons for hire from place to place", which would include a TNC, yet the TNC Law prohibits cities and towns from regulating the TNC industry.

22. The taxi regulations in the City of Boston are elaborate, highly detailed, very restrictive and controlling virtually every aspect of the taxi business.

23. Boston's taxi regulations are designed to ensure that Boston's taxi services are safe, reliable and non-discriminatory.

24. The two industries, taxicab and TNCs, provide essentially identical services, yet with the enactment of the TNC Law are being regulated in an entirely different manner from each other.

25. The differential treatment of the TNCs and taxis is arbitrary and irrational.

26. There is no rational basis for the disparate treatment.

27. The City issues a limited number of taxi licenses, called taxi medallions.  A taxicab cannot operate in Boston without one of the 1825 city-issued taxi medallions.

28. The TNC Law sets no limits on the number of Transportation Network Driver Certificates.

29. Allowing for an unlimited number of TNCs creates public safety, traffic flow and congestion issues for the Commonwealth, especially in the City of Boston.

30. The TNC Law grants the Department of Public Utilities with the power to determine the suitability of an applicant to obtain a Transportation Network Driver Certificate.

31. This Certificate differs from a hackney license in several key ways.

32. The TNC Law does not require TNC drivers to obtain a license or to take any particular test in order to become a driver for a TNC.

33.   The TNC driver is issued a TNC Certificate after merely passing a background check, which includes information about their driving and criminal history.

34.   However, every taxi driver must have a Hackney Carriage Driver's License.

35.   An applicant for a license must meet seventeen criteria before they can even apply for a license, including:

1.   be twenty-one (21) years of age or older;

2.   pass a standard examination demonstrating the ability to speak, read, write and understand the English Language;

3.   participate in Hackney Carriage testing and training as determined by the Inspector of Carriages;

4.   have an original Birth Certificate, Alien Card, Asylum Document, US Passport or Naturalization Papers;

5.   not have a Hackney Carriage Driver's License that is revoked or suspended in any jurisdiction;

6.   have a valid Massachusetts Driver's License;

7.   have had a Driver's license in the United States for at least two (2) years;

8.   not have been adjudged a Habitual Traffic Offender, as defined by Massachusetts General Law Chapter 90, Section 22F, or the equivalent in any jurisdiction, within the past five (5) years;

9.   not have any outstanding or unresolved driving infractions which could result in the applicants Driver's license being suspended or revoked in any jurisdiction;

10.   not have had his or her Driver's License suspended for five (5) or more Surchargeable Incidents, as defined by Chapter 211 of the Code of Massachusetts Regulations section 134, or the equivalent in any jurisdiction, within  past five (5) years;

11.   not have more than four (4) violations of the Traffic Laws and/or At-Fault Accidents as, defined by Chapter 211 of the Code of Massachusetts Regulations Section 134 or an equivalent department in the last three (3) years

8

(violations and accidents occurring on the same date will count as only one) in any jurisdiction;

12. not have any Operating Under the Influence of drugs or alcohol convictions or dispositions under Massachusetts General Law Chapter 90 section 24D within the past five (5) years or the equivalent in any jurisdiction;

13. not have any felony convictions within the last five (5) years in any jurisdiction;

14. not have any drug convictions in the last five (5) years in any jurisdiction;

15. not have any dispositions for a criminal offense, in any jurisdiction, that would result in the denial of a license, including admissions to sufficient facts or continuance of an offense without resolution, unless the circumstances of such incident are reviewed by the Inspector of Carriages as to the specific facts and circumstances and the applicant is thus approved by the Inspector of Carriages;

16. not be required to register as a sex offender in any jurisdiction; and

17. not have any outstanding or unresolved criminal court cases in any jurisdiction which could result in the license being denied if the Applicant was convicted of the alleged offense.

(See Hackney Carriage Driver Standards, Taxi Rules Section 2, II attached hereto as Exhibit D).

36. Many of the criteria set forth above do not have to be met by TNC drivers, and some that do are much less burdensome.

37. Once taxi drivers have a license they must abide by a strict standard of rules, requiring them not to possess alcohol in their vehicle, not to talk on a cell phone, and not to smoke or permit smoking.

38. TNCs are not required to abide by the same rules.

39. The TNC Law states that the Registrar of Motor Vehicles shall establish rules relating to the inspection of transportation network vehicles.

40. Current regulations related to the City of Boston taxis require that the taxis are inspected twice annually in addition to the regular vehicle inspection that occurs each year.

41. Medallion owners must have taxis that meet strict requirements concerning vehicle age, installed equipment and overall look of the vehicle.

42. In contrast, TNCs may use any vehicle model or age, and do not have to have particular equipment installed or design adhered prior to use (meter, partition, lettering).

43. TNCs will only have to use removable decals, and will have no permanent markings on their vehicle to distinguish them from traditional vehicles.  Permanent markings assist and protect consumers and increase public safety.  Removable decals provide no assurance that the particular vehicle is in fact a TNC as someone could easily steal or borrow decals from a TNC driver and use them in nefarious ways to lure consumers into their vehicle.

44. Taxis have a protective barrier (referred to as a partition) of metal and lexan between the front and back seats.  These barriers not only protect drivers from assault and theft but also protect the driver from impaired passengers that may interfere with the driver's ability to operate the taxi thereby causing an accident.

45. TNCs have no such requirement.

46. Every Boston taxi must be equipped with an Inspector approved GPS system that gives the Boston Police Department internet access, both in real time and for a year after any trip, to the location of every taxi, the pick-up and drop off points and how the passenger paid and the exact route followed.  Every taxi must also have a panic button.

47. TNCs do not have the same GPS or panic button requirements.

48.   Taxis have set meter rates that apply to all taxi rides, even when taxis accept passengers via a smartphone dispatch in an identical fashion as the TNCs.

49.   Yet the TNC Law permits the TNCs to charge any rate, and to impose large surcharges during times of high demand except during a state of emergency.

50.   Taxi owners are required to buy and operate very expensive wheelchair accessible vehicles.

51.   No such obligation extends to TNCs.

52.   Such arbitrary favoritism damages the Plaintiffs by reducing their revenues. It also seriously limits their ability to compete fairly against the TNCs to recruit drivers, which threatens to destroy their businesses entirely.

53.   Boston taxi drivers are required to accept multiple forms of payment, including cash, credit cards, vouchers, and Boston Taxi Industry Elderly Program ("BTIEP") coupons, which allow customers, who are elderly, handicapped, disabled or suffer from cancer to pay discounted rates.

54.   TNCs do not have this requirement, and in fact, most are forced through the TNC to accept only credit card payments through the app.

55.   The TNC Law is creating a new type of insurance that may be procured by TNC drivers that does not yet even exist in the marketplace, and is not traditional commercial liability insurance.

56.   Taxi drivers, however, are required to carry expensive primary commercial liability insurance that applies whenever taxis are picking up, carrying or looking for passengers, or even when off duty.

57.   Livery insurance in Massachusetts can cost between $5,500-$13,000 per year.

58. New prospective taxi drivers must go to Boston Police to apply for a license. They pay $32 for the license and $50 for fingerprinting, wait several days and then they are assigned a week-long class and examination that must be passed before the license can be issued. Wait lists for classes can be two weeks to six months, while TNCs can upload information and put a driver and car in service within 24-48 hours, without either meeting the driver or seeing and/or inspecting the vehicle.

59. Below are the financial differences between taxis and TNCs as a result of the disparate treatment in the regulation of taxis and TNCs:

| **ITEM** | **TAXIS** | **TNCs** |
| --- | --- | --- |
| Medallion Purchase | $175,000 – 700,000 | $0 |
| Vehicle Insurance | $5,000 – $10,000 | $400 – $1,000 |
| Vehicle Purchase | $20,000 - $30,000 | Vehicles 10 years old |
| Vehicle Setup (vinyl seats, vinyl floor, partition, emergency lights, lettering) | $2,000 | $0 |
| Tinted Glass Removal | $1,000 | $0 |
| Hackney License | $32 | $0 |
| Fingerprinting | $50 | $0 |
| Medallion Renewal | $100 | $0 |
| Meter Seal | $40 | $0 |
| BTEIP elderly handicapped | $150 | $0 |
| Radio Associations | $20 – $50/wk | $0 |
| Meter Rates | $2.60 base/ 0.40¢ per1/7 mile $2.80/mile $28 wait time/ Flat rate $3.20 | $2 Base rate/$1.24 mile/ $1.15 service fee |
| Corporation Taxes | $456 | $0 |

| Accounting Fees | $500 – 1000 | $0 |
|---|---|---|
| Credit Card Processing | 5 – 6 % | ? |
| Meter Purchase | $300 | $0 |

60. The TNC Law allows MassPort and MCCA to establish rules to allow TNCs to pick up at both Logan Airport and the Convention Center.

61. In 1997, the Massachusetts Legislature directed the Boston Police Commissioner that issuance of taxi medallions shall be made by "public auction, public sale, sealed bid or other competitive process" in an effort to raise money for the financing of convention and exhibition centers (See M.G.L. Chapter 152, § 20, attached hereto as Exhibit E).

62. Pursuant to the state's directive, the City of Boston auctioned 225 new medallions between 1999 and 2001 at approximately $180,000 each, and the proceeds ($40 million) were used to finance the BCEC.

63. The State financed the convention center through the auction of taxi medallions allowing innocent individuals to pay hundreds of thousands of dollars per medallion, but allow TNCs to come in with no limit to the number of TNCs on the road, and no requirement that they buy-in to purchase the right to provide transportation services leaving the taxis severely disadvantaged.

64. Despite being financed off the backs of taxi medallions, the TNC Law allows TNCs to provide services and pick up at the bustling BCEC.

65. The hallmark of the marketplace in transportation services created by the heavily regulated industry had been competition on a level playing field.

66. Taxi owners and drivers worked in a competitive environment, all subject to the same regulations – until the advent of TNCs.

67.  Taxi owners and TNCs provide the same service, transportation for hire, which includes, a driver, a vehicle, a passenger and a payment.

68.  These elements do not depend on how the connection between driver and passenger is made, whether visual (by street hail or taxi queue), or electronic (by telephone, smartphone or website).

69.  The taxi owners use the same technology as the TNCs, in fact, they use some of the exact same platforms in order to conduct their business.  There are truly no differences between the taxi industry and the TNCs other than through regulations that were created by the TNC Law.

70.  For decades, the Commonwealth permitted the City to heavily regulate all For-Hire Transportation providers under uniform rules. The rules were designed to protect the public, regulate traffic, address congestion and provide an essential public service.

71.  The Commonwealth also mandated additional medallions and required that the medallions were auctioned to pay for the convention center.

72.  The de facto taxi companies, TNCs (such as UberX and Lyft) provide the exact same service that traditional taxi companies do. They dispatch drivers to passengers who pay fares based on the time and distance traveled. That the de facto taxi companies dispatch the car and driver via smartphone does not distinguish their business activity from that of traditional taxis, which also now use smartphones as one means of connecting driver and passenger.

73.  TNCs are an essentially unlicensed taxi service.

74.  Use of a smartphone app does not change the nature of the business. It does not alter the need for uniform rules for all who engage in it. Use of an app merely provides an

alternative means of dispatch and payment.   The service provided remains For-Hire Transportation.

75.  An app does not make a car safer, qualify or train a driver, protect the passenger, or insure the public when accidents occur. Because cars, drivers and passengers exist and travel in the real world, not the virtual world, the same public safety concerns exist regardless of how passenger and driver connect. Therefore, the rules governing the activity should be substantially the same for all.

76.  While the Equal Protection Clause permits government to draw distinctions that are rationally related to legitimate governmental interests, the distinctions summarized above and detailed below do not pass constitutional muster. They are arbitrary, fundamentally unfair and unconstitutional.

77.  The Commonwealth has arbitrarily forced participants in the same business to operate by very different rules.

78.  The constitutional protections of equal protection and due process rest on bedrock principles of fundamental fairness. Under our constitutional system, the government must apply reasonable rules fairly to similarly situated persons.

79.  People engaging in the same business activity must be held to the same rules and regulations.

80.  The rules must rationally relate to a legitimate governmental objective.

81.  The Commonwealth's disparate treatment of Plaintiffs and TNCs violates all of these principles.

82.  In addition, the Commonwealth permitted and in legislation directed the City to require taxi owners to pay large sums for the "exclusive" license to engage in the business of

For-Hire Transportation. For decades, taxi owners accepted these burdens and expenses as part of a quid pro quo with the City for the exclusive rights granted. The taxi owners had the exclusive right to provide For-Hire Transportation to individual passengers.

83.   The Plaintiffs have a property interest in their taxi medallions.

84.   Principles of fundamental fairness also animate the constitutional right to just compensation when the government takes private property. That right is particularly important where, as here, the government itself created the property right, sold it to private parties and developed a system under which hundreds of private parties were induced and required by government to invest hundreds of millions of dollars as a precondition to engaging lawfully in business.  These constitutional protections – equal protection, due process and just compensation – allow people to take investment risks and allow businesses to compete fairly.

85.   The Defendants' actions also deprived Plaintiffs of the fundamental property right that was expressly granted with the sale of the medallion: the exclusive right of medallion owners to provide For-Hire Transportation.

86.   Requiring TNCs to comply with the same regulations as taxicabs is not only necessary to protect the health, safety and welfare of the public, but ensures the "same level playing field" for all taxicab operators, regardless of whether the rides are being generated by telephone, hailing a taxicab on the street or use of an internet app-based system.

87.   This irrational economic disparity between similarly situated operators for hire violates the Due Process and Equal Protection clauses of the Fourteenth Amendment of the U.S. Constitution.

## COUNT I
## DECLARATORY JUDGMENT

88.     The allegations set forth above are re-alleged and incorporated herein.

89.     The TNC law is unconstitutional in that it violates the Due Process and Equal Protection clauses of the Fourteenth Amendment of the U.S. Constitution.

90.     The TNC Law is invalid, null and void to the extent it infringes on the constitutional rights of the Plaintiffs.

91.     The rights, duties and legal privileges of the Plaintiffs are affected, impaired and threatened because of the new TNC Law.

92.     Plaintiffs are entitled to a declaratory judgment to determine the validity of the TNC Law or to affirm its invalidity.

93.     Plaintiffs are entitled to a declaratory judgment that the TNCs are required to comply with state and local laws pertaining to hackney carriage operators and that, until such compliance, they cannot engage in any form of "For-Hire Transportation".

94.     There exists a substantial, present and justifiable controversy between the Plaintiffs and the Defendants with respect to the validity of the TNC Law.

## COUNT II
## INJUNCTIVE RELIEF

95.     The allegations set forth above are re-alleged and incorporated herein.

96.     Because the TNC Law is invalid, Defendants must be permanently enjoined from enforcing those regulations.

97.     The Court must issue an order forcing the Defendants to enforce the current Hackney Carriage rules as to the TNCs and/or regulate both the TNCs and the taxi industry similarly.

## COUNT III
## MONETARY DAMAGES

98.   The allegations set forth above are re-alleged and incorporated herein.

99.   In the absence of appropriate and timely injunctive relief, the Plaintiffs are entitled to compensatory and special damages in an amount which will fairly and reasonably compensate them for the harm caused by the Defendants, in an amount to be determined at a trial of this matter.

## COUNT IV
## TAKINGS CLAUSE

100.  The allegations set forth above are re-alleged and incorporated herein.

101.  The Commonwealth has violated the Takings Clause because medallions are property under Massachusetts law.

102.  Medallion owners and lenders holding security interests in medallions, own property that may not be taken by the Commonwealth without payment of just compensation.

103.  Before the Commonwealth and the City allowed the invasion of the de facto taxi companies, if someone wanted to provide taxicab services, an individual had to buy or lease a medallion and comply with burdensome regulations. In return, the medallion owner received the exclusive right to provide taxi services.

104.  The Commonwealth, in order to raise money, mandated the City of Boston to auction off medallions so it could build the City's convention center on the backs of taxi medallion owners.

105.  Even though the Commonwealth raised $40 million to build the convention center from 1999-2001 by auctioning 225 medallions, when TNCs started operating in the

Commonwealth, instead of protecting the taxi medallions owners, the Defendants stood by idly and did nothing for years.

106. While a bill has finally passed, it does not regulate the industries similarly and effectively results in a taking, as the exclusivity of taxis providing Transportation-For-Hire services is gone.

107. A hallmark of property is the right to exclude, and exclusivity was an essential element of the medallion owners' property rights and determined the value of those rights.

108. Without compensation to the medallion owners or the lenders holding security interests in the medallions, the Commonwealth allows the de facto taxi companies to usurp and trespass upon the exclusive property rights of medallion owners by providing those services without buying or leasing medallions or complying with the taxi regulations.

109. The Commonwealth has thereby taken exclusive rights from medallion owners and transferred them to the de facto taxi companies without any compensation, let alone the just compensation that the Takings Clause requires.

## COUNT V
## DUE PROCESS/EQUAL PROTECTION

110. The allegations set forth above are re-alleged and incorporated herein.

111. The Commonwealth unequal treatment of the Plaintiffs and the de facto taxi companies violates the Equal Protection Clause of the Fourteenth Amendment by permitting the de facto taxi companies to engage in the taxi business without incurring the costs and limitations of complying with applicable law, while requiring the Plaintiffs and others similarly situated to comply with the City's extensive and costly taxi regulations, including the requirements to: purchase a medallion; pay annual license fees; maintain

commercial liability and worker's compensation insurance; operate only newer, regularly inspected vehicles; satisfy driver-licensing requirements, and pay thousands of dollars annually per medallion in fees and taxes.

112. The disparate treatment lacks any rational basis, especially for rides arranged in advance through smartphone apps, and adds to the competitive disadvantage the Commonwealth is imposing upon the Plaintiffs.

113. The Defendants' disparate treatment regarding driver qualifications lacks a rational basis.

114. The Defendants' disparate treatment regarding vehicle age, condition, inspections and safety features lacks a rational basis, and adds to the competitive disadvantage imposed upon the Plaintiffs.

115. The disparate treatment regarding accessibility and payment lacks a rational basis, and adds to the competitive disadvantage the imposed upon the Plaintiffs.

116. The Defendants' failure to require the de facto taxi companies to comply with these Taxi Regulations has arbitrarily imposed greater obligations on the Plaintiffs as compared to the de facto taxi companies, thereby exacerbating the competitive advantages TNCs have in the market.

117. The Commonwealth has no rational basis for treating the taxi industry and TNC industry differently as they provide the same service.

118. The Plaintiffs are suffering and will continue to suffer direct and tangible injury and damages from the Commonwealth's actions and inactions in that, without limitation, (i) the market and collateral value of the medallions and their marketability are being or will be reduced by the unequal application of the law, (ii) all who operate taxis directly

or lease vehicles with medallions to drivers are being injured in that the revenues derived from their lawful operations have been and will continue to be reduced as a result of the de facto taxi companies' operation.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs as follows:

A. Declare the TNC Law unconstitutional in violation of the Due Process and Equal Protection clauses of the Fourteenth Amendment;

B. Declare the portion of the law that preempts cities and towns from regulating TNCs unconstitutional;

C. Declare that the existing state and local laws, including the Hackney Carriage Rules, are applicable to the Transportation Network Companies;

D. Issue an order requiring the Commonwealth to regulate the TNCs the same way as the taxis;

E. Issue a preliminary injunction enjoining the Commonwealth of Massachusetts from enforcing the TNC Law;

F. Issue a permanent injunction enjoining the Commonwealth of Massachusetts from enforcing the TNC Law;

G. Grant Plaintiffs compensatory and special damages in an amount which will fairly and reasonably compensate them for the harm caused by the Defendants, in an amount to be determined at a trial of this matter;

H. Grant Plaintiffs any and all such other legal and equitable relief as the Court deems just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY.


Respectfully submitted,
By the Plaintiffs,


_____/s/ Jenifer M. Pinkham_____
Jenifer M. Pinkham
BBO #658031
Tiffany L. Stichel
BBO #672713
Schlossberg, LLC
35 Braintree Hill Office Park
Suite 401
Braintree, MA 02184
781.848.5028
jpinkham@sabusinesslaw.com


Dated: September 22, 2016

G:\Boston Taxi Owners Association, Inc.-BY007\v. Commonwealth of Massachusetts - 005\Docs\Complaint092216.docx